**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**IN ADMIRALTY**

CASE NO.:

YANLI GONG, Individually and as
Personal Representative for the Estate of
Hyon Duk Shin, deceased, and as Parent
and Natural Guardian of M.S. and C.S.
(minors), and KWANG SHIN, Individually,

     *Plaintiffs*,

v.

NCL (BAHAMAS), LTD., a Bermuda Corporation
d/b/a NORWEGIAN CRUISE LINES (NCL),

     *Defendant*.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, YANLI GONG, Individually and as Personal Representative for the Estate of

Hyon Duk Shin, deceased, and as Parent and Natural Guardian of M.S. and C.S. (minors), and

KWANG SHIN, Individually, by and through their undersigned counsel, hereby sue Defendant

NCL (Bahamas), Ltd., a Bermuda Corporation d/b/a NORWEGIAN CRUISE LINES (NCL)

(hereinafter "NCL"), and allege as follows:

## JURISDICTION, VENUE, AND PARTIES

1.     This is an action for money damages and the amount in controversy is in excess of

$75,000.00 exclusive of interest and court costs.

2. This Court has subject matter jurisdiction over the matter under the Admiralty and Maritime Jurisdiction of the Court pursuant to Article III § 2 of the United States Constitution and 28 U.S.C. § 1333.

3. Plaintiff, Yanli Gong (hereinafter "Ashley Gong"), is a citizen and resident of Pennsylvania, U.S.A; wife of the deceased; and mother to M.S. and C.S.

4. Plaintiff, Ashley Gong, brings this action in her individual capacity, as well as in her capacities both as Personal Representative for the Estate of Hyon Duk Shin, deceased, who, when alive, was also a citizen and resident of Pennsylvania, U.S.A.; and in her capacity as Parent and Natural Guardian of the two (2) minor children in this action, M.S. and C.S. (hereinafter collectively referred to as the "Minor Plaintiffs").

5. The Minor Plaintiffs are citizens and residents of Pennsylvania, U.S.A.

6. Plaintiff, Kwang Shin, is a citizen and resident of Pennsylvania, U.S.A.; mother of the deceased; and grandmother of M.S. and C.S.

7. Hereinafter, when reference is made to "Plaintiffs", reference is made to all Plaintiffs named herein, including Ashley Gong, Hyon Duk Shin, Kwang Shin, and the Minor Plaintiffs, where appropriate.

8. Defendant NCL is a foreign corporation, incorporated under the laws of Bermuda, and licensed to conduct business in the State of Florida.

9. The tragedy resulting in the foregoing action occurred in the territorial waters of Bermuda, on an NCL cruise embarking and disembarking in a New York, U.S.A. port.

10. This matter is being filed in the United States District Court for the Southern District of Florida, Miami Division, pursuant to the forum-selection clause contained in Section 15(b) of the Ticket Contract issued by Defendants.  NCL is in possession of a copy of the ticket

contract.  Defendants have agreed, in writing, that jurisdiction and venue are proper in this Court pursuant to the Ticket Contract.

11.     All conditions precedent to the maintenance of this action have been performed, or, alternatively, have been waived.

## **GENERAL ALLEGATIONS**

12.     At all times material, NCL owned, operated, managed, maintained, and controlled the vessel, *Norwegian Getaway*.

13.     On or about November 24, 2023, Plaintiffs redeemed a NCL cruise voucher to enjoy their son's spring break, selecting a weeklong cruise to Bermuda, to take place March 24 – March 31, 2024, including a NCL shore excursion to Horseshoe Bay Beach, Bermuda.

### I.     **NCL's Promotional Material and Statements Concerning its Shore Excursions**

14.     Plaintiffs' electronic tickets encouraged them to visit NCL-selected shore excursion destinations in Bermuda, directing passengers to their shore excursion website, and advising them that NCL excursions had "important added benefits" including the fact that such excursions were provided by "safe and reliable tour operators."

**Shore Excursions:**
Guests are encouraged to book their Shore Excursions through Norwegian Cruise Line for the widest selection of tours along with some important added benefits – safe and reliable tour operators, easy pick-up and drop-off at the pier. For complete tour descriptions and to pre-purchase, please visit www.ncl.com/excursions or call 866.625.1167, Monday - Friday 9 am - 9 pm or Saturday and Sunday 10 am - 6:30 pm EST.

15.     On its website, NCL publishes promotional and informational material about such excursions, including the "Horseshoe Bay Beach Transfer" shore excursion.

16.     NCL encourages passengers and prospective cruisers to visit shore excursions selected by NCL, as opposed to venturing on their own, touting them in a promotional section titled "Why Book with Us" as offering "[p]eace of mind", because they are "run by insured

operators" and assuring passengers that these excursions, are both hand-picked by NCL who "work[s] with reputable, local tour operators", and closely monitored by NCL.

https://www.ncl.com/shore-excursions/WRF_20/Horseshoe-Bay-Beach-Transfer

## WHY BOOK WITH US?

We work with reputable, local tour operators to offer you a wide variety of excursions to choose from, in every port you'll visit.

**We offer you convenience, flexibility and peace of mind.**

- Convenience of one-stop shopping for all of the ports you'll be visiting
- No hidden costs for transfers or entrance fees - the price you see is what you pay
- Dedicated pre-cruise and onboard specialists are available to assist you
- Leverage the knowledge and experience of onboard consultants during your cruise
- Be one of the first off the ship in every port of call
- Never get left behind. If a Norwegian organized tour is late, the ship will wait for you
- Peace of mind knowing your tours are run by insured operators
- Flexibility to modify or cancel excursions without penalty up to 48 hours prior to arrival into port. Any exceptions are noted in the tour descriptions.

**Book Early**

Our most popular tours sell out quickly so we recommend that you book early to avoid disappointment.

17.     On the NCL website page entitled "Sail Safe", NCL answers prospective passengers' frequently asked questions, including "[c]an I explore on my own while in port?" NCL encourages prospective passengers to instead book NCL shore excursions, stating **"[we] work[] closely with our destination partners"** and "to keep our guests **as safe as possible**, we highly recommend taking our company organized shore excursions as **a more controlled environment** for you to enjoy your time in each of the destinations." (emphasis added).

**https://www.ncl.com/sail-safe#sail-safe-faq**

| Can I explore on my own while in port? | − |
| --- | --- |

As delivering the best experience for our guests is always a top priority, after working closely with our destination partners, we anticipate that guests will be free to explore certain ports of call on their own. Please keep in mind that this is largely dependent on the local health authorities and the evolving regulations, which are subject to change. In order to keep our guests as safe as possible, we highly recommend taking our company organized shore excursions as a more controlled environment for you to enjoy your time in each of the destinations.

For additional information, please visit Cruise Travel Requirements by Country.

18.     On the NCL website page titled "Travel Requirements by Country – What to Know Before Your Cruise", NCL again assures prospective passengers that NCL works "closely with local government and health authorities."

**https://www.ncl.com/travel-requirements-by-country**

**Country Specific Travel Requirements Note:**

Norwegian Cruise Line works closely with local government and health authorities to gather travel requirements for the destinations we visit. While this information is provided as a courtesy to our guests, destinations we travel to may have very specific entry requirements due to health and safety protocols.

19.     NCL also provides a difficulty scale for each shore excursion it offers, letting passengers know what to expect.  Excursions fall on a scale from 1 to 3: either "1: Easy", "2: Moderate", or "3: Challenging."

20.      With respect to Horseshoe Bay Beach Transfer in particular, NCL specifically advertises the activity to NCL's passengers as "*Beach/Swimming*" (original italics), and described that activity at the Horseshoe Bay Beach location as "*Easy*". (original italics). NCL describes it as a **"1"** on activity level.

https://www.ncl.com/shore-excursions/WRF_20/Horseshoe-Bay-Beach-Transfer



### Horseshoe Bay Beach Transfer
#### DETAILS
**4 hrs** *Estimate Duration*

For those who would like to enjoy the beach, jump aboard the Beach Bus and enjoy round-trip transportation to the world-famous Horseshoe Bay Beach. Soak up the sun, swim in the crystal clear water or just relax in the pink sand.

**Need to Know:**

**Note:** Wear your swimsuit, bring a towel and sunscreen. Horseshoe Bay accepts cash/credit cards for additional purchases. Food, beverages, beach chairs and umbrella rentals are available from the Beach Club at additional cost. Guests who go ashore do so with the understanding that they will be mixing with members of the general public.

Check Out the
## ACTIVITY ATTRIBUTES

**Excursion Type:**

*Beach/Swimming*

**Activity Level:**

| **1** | **2** | **3** |
| Easy | Moderate | Challenging |

Tours with this activity level involve walking over relatively level terrain, possibly some cobblestone, gravel, or a few steps. Comfortable shoes are recommended.

21.     Plaintiffs chose to visit Horseshoe Bay Beach and relied upon the assertions made by NCL: in the Plaintiffs' tickets, on NCL's website, in promotional brochures, emails, and via NCL representatives both pre-boarding *and* onboard the *Norwegian Getaway*, including those assertions described in paragraphs ¶¶ 14 – 20 above.

22.     Mr. Shin and Ms. Ashley Gong looked at the NCL information prior to choosing Horseshoe Bay Beach as a location to visit, and collectively decided that it was a suitable, safe option for their family after viewing NCL's publications, including specifically those described in paragraphs ¶¶ 14 – 21 above.

**II.    The Tragedy: Mr. Hyon Duk Shin Looses His Life at Horseshoe Bay Beach**

23.     Relying on the safety and reputability of NCL as well as NCL's representations regarding its shore excursion locations, including NCL's information on the subject excursion, Plaintiffs decided to visit Horseshoe Bay Beach when they arrived in Bermuda on March 27, 2024.

24.      Plaintiffs reviewed NCL's information regarding the subject location and relied upon NCL's representations exclusively and to Plaintiffs' detriment in deciding to both participate in and in attending such location.

25.     Based upon NCL's information concerning Horseshoe Bay Beach, Plaintiffs reasonably understood that NCL conducted regular inspections of the conditions and nature of the subject location to ensure that it was reasonably safe for NCL's passengers, and Plaintiffs relied upon such understanding to Plaintiffs' detriment in deciding to participate during Plaintiffs' cruise with NCL.

26.     NCL did not issue any warnings regarding the Horseshoe Bay Beach location prior to passengers leaving the ship, neither before or on the date of the incident.

27.     Plaintiffs arrived at the subject location described by NCL as "easy" on or about 2:00 P.M and made their way to the beach, staying near the shore either snorkeling in the shallow water or tossing a football on the sand.

28.     The extent of the dangers posed by the waters of Horseshoe Bay Beach--which Defendant-NCL had promoted to its passengers as an "easy . . . swimming" activity—including the on-scene life-threatening nature of the current and undertow present and the effects of adverse weather patterns, were not apparent.

29.     A local Bermudian, Ali Watlington, observed that the day of the tragedy was a gorgeous day, and the water looked calm and inviting on the beach, with minimal waves, but there were strong rip currents which were difficult to see at sea level, but which Ms. Watlington could observe from a lookout far above the beach.

30.     Ms. Watlington also observed that the rip currents are present in all conditions, such that even if there was no indication of adverse weather conditions at the time, the danger persisted.

31.     Around 2:45 P.M., Mr. Hyon Shin's wife and mother, Plaintiffs Ashley Gong and Kwang Shin, were sunbathing onshore while Mr. Shin and their children, the Minor Plaintiffs, re-entered the water.

32.     Shortly thereafter, the children came running back to their mother, Plaintiff Ashley Gong, and crying because their father, Mr. Shin, had gone to save a girl who was drifting away due to the unperceived current and undertow.  Mr. Shin was able to rescue the girl.

33.     However, by the time Plaintiff Ashley Gong located her husband, he was in the very back of Horseshoe Bay Beach. Eventually he started floating out of the bay, toward the location of the girl he had saved and the open ocean.

34.     By this time, it was clear to Plaintiffs Ashley Gong and Kwang Shin that Mr. Shin was drowning and unconscious.

35.      Plaintiffs Ashley Gong and Kwang Shin frantically yelled for help on the crowded beach but there were no lifeguards on duty.

36.     After significant time and effort, they found a local woman, Ali Watlington, who volunteered to swim out and rescue Mr. Shin.

37.     Once Mr. Shin was brought back to shore, both CPR and AED were attempted on shore, causing water to erupt from Mr. Shin's nose and mouth.

38.     Ali Watlington observed that Ashley Gong was in a state of hysteria as Ashley Gong witnessed her husband drown, the chaotic rescue, and attempts to revive him.  Ali Watlington attempted to calm Ashley Gong but without success.

39.     Ali Watlington had to rescue another individual that day as well, who had attempted to save Mr. Shin and got caught in the rip current and undertow.

40.     Mr. Shin was subsequently taken to the hospital where doctors attempted to resuscitate him, but to no avail.

41.     Plaintiff Ashley Gong observed that her husband's skin was still warm and pushed on her husband's chest attempting to resuscitate him.

42.     Plaintiffs subsequently learned that an autopsy was required to be performed before Mr. Shin's body could be sent back to the United States, and was compelled to undergo that process as well.  The cause of Duk Shin's death was determined to be drowning.

**III.    Allegations Relevant to Notice**

43.     The subject excursion was unreasonably hazardous for reasons that include, but are not limited to: (i) the naturally occurring strong current and undertow at the beach bay, (ii) the lack

of look-outs or lifeguards provided by NCL, (iii) the lack of warnings provided by NCL regarding the subject excursion, and (iv) the counter-productive and misleading information by NCL that the area was safe and "easy".

44.     NCL had notice of these dangerous conditions through public warnings from multiple government entities, available weather and sea condition forecasts, a variety of cruise passenger reports, and prior similar incidents.

   a.   *Public Warnings from Multiple Governmental Entities*

45.     As an initial matter, Bermuda is an overseas territory of the United Kingdom (a country NCL operates cruises with) that publicly warns travelers regarding its territory, cautioning on its official, government, foreign travel advice website that "[t]here are strong rip currents in many places across Bermuda. **Most people in Bermuda do not swim in the sea until after Bermuda Day in late May.**" (emphasis added).

**https://www.gov.uk/foreign-travel-advice/bermuda/safety-and-security**

**Swimming safety**

There are strong rip currents in many places across Bermuda. Most people in Bermuda do not swim in the sea until after Bermuda Day in late May.

See water safety on holiday from the Royal Life Saving Society.

46.     The Government of Bermuda itself had, on multiple occasions, warned of dangerous rip currents at Horseshoe Bay Beach prior to the subject tragedy.

47.     For instance, following the drowning of another cruise passenger in August of 2022 (alleged in more detail below), Bermuda's Minister of National Security Michael Weeks warned of the dangers of rip currents after the incident, noting "I want to take this opportunity to urge residents and visitors to exercise caution and vigilance while in and around the Island's waters"

and "[p]eople should be particularly vigilant over the potential for unpredictable rip-tides in our waters—especially on south shore beaches."[1]

48.     The Bermuda Government also issued warnings on social media, including the following publications on Twitter/X:



---

[1] https://tnnbda.com/n-s-minister-offers-sympathies-to-family-of-visitor-of-horseshoe-bay-incident/



**Bermuda Government** ✔ @Bda... · 9/11/23   •••
The Department of Parks also wishes to issue a special advisory for beachgoers. **Lifeguards** at Horseshoe Bay Beach have raised the red flag, indicating a "high hazard" due to rough conditions, including powerful surf and dangerous rip currents.



   💬    ♻ 4    ♡ 3    📊 1.2K    🔖   ⬆

49.     The Government of Bermuda's Department of Parks had often warned of rip currents in the South Shore areas as well, including Horseshoe Bay Beach.  On or about June of 2023, the Department of Parks issued a statement that "advised strongly to use caution while at South Shore beaches, particularly Horseshoe Bay Beach in Southampton" due to "[d]angerous rip currents along South Shore beaches."[2]

50.     On April 18, 2024, less than a month after the subject incident, the U.S. Consulate General in Bermuda issued similar warnings evidencing the persistent and historical nature of the dangerous conditions, noting that local lifeguards were only scheduled between May 1 – October

---

[2] https://www.royalgazette.com/weather/news/article/20230630/riptide-warning-issued-for-south-shore-beaches/

31 each year and observing that "[t]his schedule had previously aligned with the cruise season" but the "cruise season has lengthened."



1/15/25, 10:48 AM                                    No Lifeguards at Horseshoe Bay Until May 1 - U.S. Consulate General in Bermuda

**U.S. CONSULATE GENERAL IN BERMUDA**

By **U.S. CONSULATE GENERAL HAMILTON**

APRIL 18, 2024

There is currently no lifeguard coverage on Bermuda beaches.

Rip tides, particularly on South Shore beaches, can be dangerous.

Take all precautions.

Lifeguards are scheduled to be on duty May 1 through October 31 at Horseshoe Bay Beach, and on duty May 24 through Labor Day on John Smiths Bay Beach, Clearwater Beach, and Turtle Beach.

This schedule had previously aligned with the cruise season. Since the cruise season has lengthened, the Government of Bermuda is exploring expanding lifeguard services on these beaches to better align with future cruise seasons.  However, there will be no lifeguards deployed before May 1 this year at Horseshoe Bay Beach or before May 24 at John Smiths Bay Beach, Clearwater Beach, or Turtle Beach.

51.     According to local resident Ali Watlington, Horseshoe Bay Beach is known by locals to be dangerous as deaths happen every year.

52.     NCL admits in its own publications to working closely with local authorities to provide a "controlled environment" (*See e.g.* ¶¶ 16–17) and had notice from such inspections and correspondence regarding the dangerous rip currents and lack of local lifeguards on south shore beaches, and especially Horseshoe Bay Beach.

> b.  *Weather Conditions*

53.     On the March 27, 2024 date of the incident, according to the Bermuda Weather Service, Bermuda was experiencing a "complex low-pressure system" resulting in "heavy rainfall and near gales" with the system moving "near the island" and "toward the southeast."

https://www.weather.bm/climatereport/climateReport.asp

**BWS - Written Summary**



**BWS Daily Climatology Written Summary**
**March 1 2024 to March 31 2024**
(Compiled: Wednesday, January 22, 2025 19:17)
**Written Summary** | **Table One** | **Table Two** | **Graphs** | **CSV File**

## Overall, a sunny, warm and dry March compared to normal
Last edited: Wednesday, April 03, 2024

The dominant synoptic feature over local conditions flipped during March from high pressure in the early month to a complex low in the late month, otherwise sequences of fronts, troughs, and high pressure with a steady west to east progression were evident. Relative to the 1991-2020 normals & period averages the monthly means of parameters were as follows: air temperature and Sea Surface Temperature were notably above normal, between the 75th and 90th percentile; total sun-hours were above normal, between the 50th and 75th percentile; surface pressure was below normal, between the 25th and 50th percentile; and total precipitation was notably below normal, between the 10th and 25th percentile. Compared to the 2001 to 2020 period average the wind direction was observed about 15% more often from the southeast and southwest with fewer observations from the northwest and north. Other phenomena of note included: a persistent cold eddie centred to the northeast with tidal hights below predicted through the entire month; and despite the below normal monthly precipitation, the 90-day precipitation index ended the month a little above normal at 103%.

The month began with near record high surface pressure associated with the extension of a ridge-axis over Bermuda, although by the 8th more unsettled conditions arrived with the first of a series of cold front & trough passages from the west through northwest. Observations included: both the month's absolute maximum and absolute minimum surface pressure of 1034.9 hPa on the 2nd, and 1002.7 hPa on the 10th; thunderstorms on a very active trough between the 7th and 8th; and near-gale to gale force winds with peak winds of 45 knots on the 10th and 11th.

During mid-month a broad area of high pressure migrated toward the mid-Atlantic with its centres either south or just over Bermuda. Despite the high pressure, on the 14th, an unusual event occurred associated with a surface trough; based on weather radar data there was a significant difference in accumulated precipitation across the Island with over an inch in western parishes and only two one hundredths of an inch in eastern parishes. Then between the 17th and 24th a pattern of of cold frontal passages, troughs and high pressure reestablished.

During the late month the influence of a complex low-pressure system was experienced, mostly between the 24th and 29th. As a slow-moving cold front passed over the area on the 24th, heavy rainfall and near gales were noted, although in general prolonged periods of low cloud, mist and drizzle were common as the low centres gradually tracked near the Island while moving toward the southeast. On the 29th a cold frontal passage from the west cleared the way for the approach of high pressure and sunny skies on the 31st.

### 3-month Seasonal Forecast – Apr/May/Jun 2024
Compared to normal the 3-month seasonal forecast for the area around Bermuda indicates: precipitation accumulation with no clear probability of above, below, or near normal accumulation; and a sea surface temperature of above normal (50% to 60% probability). This forecast is based on all currently available (14) models in the WMO Lead Centre for Long-Range Forecast Multi-Model Ensemble - https://wmolc.org/seasonPmmeUI/plot_PMME.

54.    On the *Norwegian Getaway*'s passage to Bermuda, Plaintiff Ashley Gong, wife of deceased Duk Shin, observed that the ship was delayed due to the weather conditions, and the ship was "shaky" as it made its way to Bermuda, unlike other cruises Ms. Gong had been on with NCL.

55.    NCL had access to publicly available, local weather forecasts prior to the incident and was aware of the weather conditions in the area at the time of the incident.

        *c.   Visitor and News Reports Regarding the Dangers of Horseshoe Bay Beach*

56.     As early as 2012, visitors of Horseshoe Bay Beach have posted warnings in publicly available reviews posted online.

57.     One such site, Trip Advisor, is riddled with reviews cautioning prospective visitors regarding the dangerous rip currents and undertow.  The following are a few of the many warnings posted publicly on Trip Advisor:

<u>https://www.tripadvisor.com/Attraction_Review-g147261-d147919-Reviews-<br>Horseshoe_Bay_Beach-Southampton_Parish_Bermuda.html</u>

- **October 2012/Username: Fallbeach**: "It is very rough, be careful with young kids, there is an undertow and it's easy to get knocked over."
- **October 2012/Username: ImnowaHoosier**: "Spoke to the lifeguard after seeing her rescue someone and was informed that it was her fourth rescue that day.  I guess if you want to risk your life, at least do it here where they can rescue you!!"
- **November 2013/Username: Romany**: "The south shore is unprotected by reefs so the waves are really strong with an undertow.  It was quite nerve-wracking to watch the kids getting knocked over and pulled under."
- **October 2014/Username: Peter I**: "I used to live here . . . most times I went [the] sea was rough. . . ."
- **July 2017/Username: DeeA**: "The water was crystal clear and postcard blue...but the life guards were busy with the rip currents."
- **September 2017/Username: tomrudz**: "The water was very rough, and within a short while after we arrived, they closed the water due to riptides"
- **June 2019/Username: SA02138**: "The lifeguard keeps a careful watch on swimmers who brave the riptide."
- **July 2022/Username: scubagirlNYC**: "When we visited in July the water was closed due to rip currents and Portuguese Man of War"
- **September 2022/Username: Roberto D**: "I believe that they needed more hands on deck for the amount of people visiting the beach at once."
- **June 2023/Username: AustintoBoston**: "The water was rough on the day I went, so nobody was allowed to swim."
- **August 2023/Username: Karen P**: "I got knocked down by a rogue wave and nearly lost my hat and sun glasses. Same for everyone else."

58.     Several news articles have also been published mentioning the dangerous conditions.

59.     The Bermudian published an article about Horseshoe Bay on August 29, 2024 indicating that the dangerous ocean conditions were common knowledge and stating, "[a]s is typical of our south shore beaches, rip tides can sometimes occur so we appreciate the daily lifeguard service here during the summer season."[3]

60.     U.S. News' travel section on Horseshoe Bay Beach, Bermuda states "[t]ravelers also warn that the ocean's waters can be rough with a strong undertow. . . ."[4]

### d.  Prior Similar Incidents at Horseshoe Bay Beach

61.     NCL also had notice of the dangerous conditions posed by Horseshoe Bay Beach based on a number of prior similar incidents.

62.     On August 27, 2012, a man in his thirties was reported as having been in distress, after being pulled out to sea in Horseshoe Bay Beach and under the water, requiring rescue by a volleyball team that happened to be on the beach at the time.[5]

63.     On September 19, 2014, 63-year-old American Ruth Birtwell from Connecticut was knocked over by a wave and pronounced dead.[6]

64.     On September 18, 2015, one passenger aboard a similar NCL cruise from New York to Bermuda, docking at the same Royal Naval dockyard, nearly died due to drowning in Bermuda, and a 56-year-old male passenger from the same NCL ship died on a NCL snorkeling expedition.

www.CruiseMapper.com

---

[3] https://www.thebermudian.com/culture/our-bermuda/into-the-ocean-horseshoe-bay-2/
[4] https://travel.usnews.com/Bermuda/Things_To_Do/Horseshoe_Bay_Beach_57859/

[5] https://www.bermudapolice.bm/report_view.php?n_id=3707 and
https://www.royalgazette.com/other/news/article/20120917/volleyballers-rescued-man-reunite-for-thank-you-party/
[6] https://www.bermudapolice.bm/content/sudden-death-american-visitor-ruth-birtwell

📅 **18 September 2015** | **Crew / Passenger Injuries and Overboards**

On September 18, 2015, a 71-year-old female passenger in a serious condition was hospitalized in Bermuda (Hamilton's King Edward VII Memorial Hospital). The woman ran into breathing difficulties during swimming at the Royal Naval Dockyard's Snorkel Park. The incident occurred at ~10 am, and was reported as "near drowning". It happened on the same NYC to Bermuda cruise (itinerary Sept 13-20) on which a 56-year-old male passenger died on NCL-sponsored Bermuda snorkeling excursion.

65.     On July 13, 2017, a 67-year-old American man from California was snorkeling and later found unconscious in the waters of Horseshoe Bay beach and pronounced dead.[7]

66.     On June 7, 2018, 39-year-old Jacolbe Fleming from Jonesboro, GA drowned at Horseshoe Bay Beach.[8]

67.     On August 20, 2022, 57-year-old cruise ship passenger Judy Severe drowned at Horseshoe Bay Beach, prompting the public warning issued by National Security Minister Michael Weeks.[9]

68.     On August 21, 2022, a 14-year-old girl swimming at Horseshoe Bay Beach drowned.[10]

69.     Each of these drownings was reported by multiple news agencies, and local authorities.

70.     Ali Watlington, the local individual that rescued the deceased, has saved individuals multiple times from South Shore beaches, including an individual in 2019 at Hungry Bay.

71.     Shortly after Mr. Shin's tragic death, 48-year-old cruise passenger Jamie Lambros lost his life, also saving a child from drowning.[11]

---

[7] https://bermudapolice.bm/content/sudden-death-american-visitor-frank-d%E2%80%99angelo
[8] https://www.bermudapolice.bm/report_view.php?n_id=5606
[9] https://tnnbda.com/police-identify-horseshoe-bay-beach-drowning-victim/
[10] https://www.bermudareal.com/tnn-14-year-old-teenaged-girl-reportedly-drowns-at-horseshoe-bay/
[11] https://www.royalgazette.com/general/news/article/20241010/horseshoe-bay-victim-died-a-hero-saving-child/

*e.   NCL's Carefully Defined Interactions with Bermuda's Tourism Offerings*

72.    NCL has been visiting Bermuda since at least as early as 1988.[12]

73.    NCL has entered into a number of long-term agreements with Bermuda's government and tourist programs, such as the 10-year agreement between 2009 and 2018 with Bermuda's Department of Tourism and Chamber of Commerce, intended to "contribute to the Bermuda experience" and "continue encouraging cruise guests to dine in restaurants onshore."[13]

74.    NCL's agreements with Bermuda were renewed again in 2016, with commitments from 2017 to 2022, at which time, Bermuda's Premier Michael Dunkley noted that NCL was one of Bermuda's "longest serving cruise partners."[14]

75.    NCL recently expanded their commitments to Bermuda through 2037, and "work annually with the Bermuda Tourism Authority to sponsor product development experiences that delight visitors."[15]

76.    Given NCL's very close relationship with Bermuda's government and tourist programs, NCL had direct access to local information regarding the safety or dangers of potential excursion sites.

## COUNT I – GENERAL NEGLIGENCE

77.    Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 through 76 above, as though alleged more fully herein.

78.    NCL owed a duty to its passengers, including the Plaintiffs, of reasonable care under the circumstances.

---

[12] https://www.latimes.com/archives/la-xpm-1988-09-11-tr-2414-story.html
[13] https://www.nclhltd.com/news-media/press-releases/detail/347/ncl-and-bermuda-announce-long-term-agreement
[14] https://bernews.com/2016/05/ncl-st-georges-cruises-new-ferries-more/
[15] https://bernews.com/2024/11/nclh-strengthens-bermuda-partnership/

79.     NCL, its agents, servants, and employees, breached NCL's duty to provide Plaintiffs with reasonable or ordinary care under the circumstances, based on the following conduct:

    a.  Failure to cancel or modify access to the subject excursion in light of the long history of life-threatening events in the area and current adverse weather conditions;

    b.  Failure to recognize the strong *current* at the beach bay naturally occurring in the subject area, and on this day strengthened by the low-pressure system near Bermuda's shores at the time of NCL's cruise;

    c.  Failure to recognize the strong *undertow* at the beach bay naturally occurring in the subject area, and on this day strengthened by the low-pressure system near Bermuda's shores at the time of NCL's cruise;

    d.  Failure to provide look-outs or lifeguards in the subject area; and

    e.  Promoting the subject area as a "more controlled environment" hand selected by NCL, thereby implying that the area was reasonably safe under the circumstances, when in fact it was not.

80.     The conduct above by NCL, its agents, servants, and employees directly caused or contributed to Mr. Hyon Duk Shin's death and the living Plaintiffs' injuries while visiting the subject area.

81.     At all times material hereto, NCL knew of the foregoing conditions which lead to the subject incident, and those repeated conditions existed for a sufficient length of time and were recurring so that NCL, in the exercise of reasonable care under the circumstances, should have learned of them and taken corrective measures, as alleged in paragraphs 43 – 76.

82.     As a direct result of the foregoing dangerous conditions to which Plaintiffs were exposed:

    a.  Mr. Hyon Duk Shin died; and as a result, his beneficiaries incurred, as a result of his death, medical and body transportation expenses, funeral expenses, lost Mr. Hyon Duk Shin's financial contributions, lost Mr. Hyon Duk Shin's

household support; and lost, among other available category of damages, Mr. Hyon Duk Shin's love, guidance, love, and support;

b. All Plaintiffs suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to post-traumatic stress, insomnia, and lack of appetite. The Plaintiffs' earning capacity has been impaired; and the adult Plaintiffs lost wages they would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiffs will suffer the losses and impairments in the future.

**WHEREFORE**, Plaintiffs demand judgment for all damages recoverable under the law and demand trial by jury.

## <u>COUNT II – GROSS NEGLIGENCE</u>

83.    Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 through 76 above, as though alleged more fully herein.

84.    NCL owed a duty to its passengers, including the Plaintiffs, of reasonable care under the circumstances.

85.    NCL, its agents, servants, and employees, breached NCL's duty to provide Plaintiffs with reasonable or ordinary care under the circumstances, evincing a conscious disregard of the consequences, based on the following conduct:

a. Failure to cancel or modify access to the subject excursion in light of the long history of life-threatening events in the area, recurring conditions, and current adverse weather conditions;

b. Failure to acknowledge the strong current at the beach bay naturally occurring in the subject area and strengthened that day by the low-pressure system near Bermuda's shores at the time of NCL's cruise;

c.  Failure to acknowledge the strong undertow at the beach bay naturally occurring in the subject area and strengthened that day by the low-pressure system near Bermuda's shores at the time of NCL's cruise;

d. Failure to provide look-outs or lifeguards in the subject area; and

e. NCL promoted the subject area as a "more controlled environment" hand selected by NCL, and an "easy" activity level, thereby implying that the area was reasonably safe under the circumstances, when in fact it was not.

86.     The conduct above by NCL, its agents, servants, and employees directly caused and contributed to Mr. Hyon Duk Shin's death and the living Plaintiffs' injuries while visiting the subject area.

87.     At all times material hereto, NCL is chargeable with knowledge of the foregoing imminent danger causing the subject incident, and the conditions existed for a sufficient length of time so that NCL, in the exercise of reasonable care under the circumstances, should have learned of them and taken corrective measures, as alleged in paragraphs 43 through 76.

88.     The circumstances constituted an imminent, clear, and present danger amounting to more than usual peril given the many drownings and near drownings on Bermuda's South Shore beaches, as described in paragraphs 61 through 71.

89.     As a direct result of the foregoing dangerous conditions to which Plaintiffs were exposed:

a. Mr. Hyon Duk Shin died; and as a result, his beneficiaries incurred, as a result of his death, medical and body transportation expenses, funeral expenses, lost Mr. Hyon Duk Shin's financial contributions, lost Mr. Hyon Duk Shin's household support; and lost, among other available category of damages, Mr. Hyon Duk Shin's love, guidance, and support;

b. All Plaintiffs suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to post-traumatic stress, insomnia, and lack of appetite. The Plaintiffs' earning capacity has been impaired; and the adult Plaintiffs lost wages they would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiffs will suffer the losses and impairments in the future.

**WHEREFORE**, Plaintiffs demand judgment for all damages recoverable under the law and demand trial by jury.

## COUNT III: NEGLIGENT FAILURE TO WARN

90.     Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 through 76 above, as though alleged more fully herein.

91.     NCL owed a duty to its passengers, including the Plaintiffs, of reasonable care under the circumstances.

92.     NCL had a duty to warn passengers of dangers that were known, and that reasonably should have been known, to NCL in places where passengers are invited to or may reasonably expect to visit beyond the point of disembarkation.

93.     On or about March 27, 2024, Plaintiffs visited Horseshoe Bay Beach, which NCL invited and reasonably expected passengers, including the Plaintiffs, to participate in since NCL promoted the location as a NCL recommended excursion site.

94.     NCL and its agents, servants, and employees breached NCL's duty to warn Plaintiffs through the following conduct:

     a.  Failure to adequately warn passengers (including the Plaintiffs) of the strong *current* naturally occurring in the subject area, and strengthened that day by the low-pressure system near Bermuda's shores at the time of NCL's cruise;

     b.  Failure to adequately warn passengers (including the Plaintiffs) of the strong *undertow* naturally occurring in the subject area, and strengthened that day by the low-pressure system near Bermuda's shores at the time of NCL's cruise;

     c.  Failure to adequately warn passengers (including the Plaintiffs) that there would be no lifeguards or look outs at the subject location; and

     d.  Failure to adequately warn or communicate to passengers (including the Plaintiffs) that NCL does not adequately inspect the scene used for the subject excursion, despite the subject excursion being promised as a "more controlled environment" selected by NCL.

95.     The above outlined conduct directly caused and contributed to Hyon Duk Shin's death and the living Plaintiffs' injuries because Plaintiffs would not have visited Horseshoe Bay

Beach had NCL and its agents, servants, and employees adequately warned or communicated the danger to the Plaintiffs.

96.     At all times material hereto, NCL knew of the foregoing conditions causing the subject incident and the conditions existed for a sufficient length of time so that NCL, in the exercise of reasonable care under the circumstances, should have learned of them and taken corrective measures, as alleged in paragraphs 43 through 76.

97.     The extent of the dangers posed by the waters of the subject excursion site were not open or obvious to a reasonable person, for the reasons alleged in paragraphs 28 through 30.

98.     As a direct result of the foregoing dangerous conditions to which Plaintiffs were exposed:

     a.   Mr. Hyon Duk Shin died; and as a result of his death, his beneficiaries incurred, medical and body transportation expenses, funeral expenses, lost Mr. Hyon Duk Shin's financial contributions, lost Mr. Hyon Duk Shin's household support; and lost, among other available category of damages, Mr. Hyon Duk Shin's love, guidance, and support;

     b.   All Plaintiffs suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to post-traumatic stress, insomnia, and lack of appetite. The Plaintiffs' earning capacity has been impaired; and the adult Plaintiffs lost wages they would have otherwise earned. These injuries and damages are permanent and continuing in nature, and Plaintiffs will suffer the losses and impairments in the future.

**WHEREFORE**, Plaintiffs demand judgment for all damages recoverable under the law and demand trial by jury.

## COUNT IV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

99.     Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 through 76 above, as though alleged more fully herein.

100.    Each of the Plaintiffs suffered severe emotional distress as Mr. Hyon Duk Shin—Plaintiff Ashley Gong's husband, the young Minor Plaintiffs' father, and Kwang Shin's son—

drowned while on vacation, during which the Plaintiffs attempted to rescue Duk Shin and frantically save his life with delayed and limited help, resulting in the loss of their closest family member directly in front of them, and then having to go through the autopsy process, and funeral.

101.    At all times material, Plaintiffs were themselves within the zone of danger created by NCL's negligence as the Plaintiffs attempted to rescue their family member, Mr. Shin.

102.    As a direct and proximate result of the negligence of NCL, Plaintiffs have suffered, and continue to suffer, emotional distress which has resulted in physical manifestations, including but not limited to anxiety, post-traumatic stress, insomnia, lack of appetite, and other emotional and physical injuries.

**WHEREFORE**, Plaintiffs demand judgment for all damages recoverable under the law and demand trial by jury.

## COUNT V: NEGLIGENT REPRESENTATION

103.    Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 through 76 above, as though alleged more fully herein.

104.    Plaintiffs, including Ashley Gong and Mr. Shin, reviewed NCL's publications regarding its Horseshoe Bay Beach excursion, including the representations identified in paragraphs ¶¶ 14 – 21 above, prior to selecting Horseshoe Bay Beach.

105.    NCL's promotional material, including its website and ticket contract referenced above, which Plaintiffs reviewed, contained the statements and descriptions set forth in paragraphs ¶¶ 14 – 21 above.

106.    NCL's promotional material and oral representations, which Plaintiffs reviewed, contained misrepresentations of material facts, including:

> a.  NCL's representations to Plaintiffs that the subject excursion, and specifically the activity of "swimming" was "easy"; when in reality, it was not "easy"

because of the presence of life-threatening current and undertow and lack of lifeguards, which NCL knew about and should have known about;

b.   NCL's representations to Plaintiffs that choosing an NCL excursion site would offer "a more controlled environment" where NCL would keep guests "as safe as possible" when in reality, Horseshoe Bay Beach had exhibited life-threatening current, undertow and a lack of lifeguards, which NCL knew and should have known about; and

c.   NCL's representation or implication that it closely watched its excursion sites to ensure its passengers' safety, when in reality, Horseshoe Bay Beach had exhibited life-threatening currents, undertow and a lack of lifeguards, which NCL knew about and should have known about.

d.   It is Defendant-NCL who posted the false allegations which the Plaintiffs viewed and used to make their decision to go to this excursion

107.    At all times material hereto, the foregoing statements NCL made or disseminated were known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be false or misleading.  This knowledge was and should have been acquired through (a) Public Warnings from Multiple Governmental Entities; (b) Weather Conditions; (c) Visitor and News Reports Regarding the Dangers of Horseshoe Bay Beach; (d) Prior Similar Incidents at Horseshoe Bay Beach; and (e) NCL's Carefully Defined Interactions with Bermuda's Tourism Offerings, as set forth in paragraphs 43 through 76 above.

108.    NCL's statements were made or disseminated with the intent or purpose, either directly or indirectly, of inducing passengers (including the Plaintiffs) to rely on the statements and to act by visiting the excursion sites.

109.    Plaintiffs justifiably relied on the representations made by NCL when Plaintiffs selected the subject excursion and participated in the same.  Plaintiffs' reliance on NCL's representations was justified considering that Plaintiffs were residents of Pennsylvania, and NCL was in the business of offering shore excursions to thousands of passengers daily from which it earned tens of millions of dollars a year.  As a result, NCL was in a much stronger position to

identify and know the potential dangers that passengers, such as Plaintiffs, would encounter when participating in this excursion.   The Plaintiffs justifiably relied on NCL to accurately advise Plaintiffs concerning the subject excursion.

110.    Had NCL not made the foregoing representations, the Plaintiffs would have made a different decision, and not participated in the subject excursion if it was not actually promoted by NCL or had NCL indicated prior deaths from.

111.    As a direct result of the foregoing dangerous conditions to which Plaintiffs were exposed:

      a.   Mr. Hyon Duk Shin died; and as a result, his beneficiaries incurred, as a result of his death, medical and body transportation expenses, funeral expenses, lost Mr. Hyon Duk Shin's financial contributions, lost Mr. Hyon Duk Shin's household support; and lost, among other available category of damages, Mr. Hyon Duk Shin's love, guidance, and support;

      b.   All Plaintiffs suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to post-traumatic stress, insomnia, and lack of appetite. The Plaintiffs' earning capacity has been impaired; and the adult Plaintiffs lost wages they would have otherwise earned. These injuries and damages are permanent or continuing in nature, and Plaintiffs will suffer the losses and impairments in the future.

**WHEREFORE**, Plaintiffs demand judgment for all damages recoverable under the law and demand trial by jury.

## COUNT VI: BREACH OF NON-DELEGABLE DUTY

112.    Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 through 76 above, as though alleged more fully herein.

113.    NCL contractually offered to provide Plaintiffs the subject cruise, and promoted its associated shore excursions.   In connection with NCL's offer, NCL's promotional material made representations concerning the subject shore excursion, outlined in paragraphs 14 through 21

above. Plaintiffs accepted that contractual offer in reliance on NCL's promotional material and oral representations, and provided consideration to NCL by purchasing the cruise to Bermuda from NCL.

114. By making representations, promoting, vouching for, contracting for and profiting from the excursion ticket contract, NCL owed Plaintiffs the non-delegable contractual duty to provide them with a reasonably safe excursion.

115. NCL breached its non-delegable duty to provide a reasonably safe excursion by the following conduct:

    a. NCL's representations to Plaintiffs that the subject excursion, and specifically the activity of "swimming" was "easy"; when in reality, it was not "easy" because of the presence of life-threatening current, undertow and lack of lifeguards, which NCL knew and should have known about;

    b. NCL's representations to Plaintiffs that choosing an NCL excursion site would offer "a more controlled environment" where NCL would keep guests "as safe as possible" when in reality, Horseshoe Bay Beach exhibited life-threatening current, undertow and a lack of lifeguards, which NCL knew and should have known about; and

    c. NCL's representation or implication that it closely watched its excursion sites to ensure its passengers' safety, when in reality, Horseshoe Bay Beach exhibited life-threatening current and undertow and a lack of lifeguards, which NCL knew and should have known about.

    d. Failure to recognize the strong current and undertow naturally occurring at the subject location, and aggravated this day by the effects of adverse weather; and

    e. Failure to provide look-outs or lifeguards for the subject excursion location.

116. As a direct result of the foregoing dangerous conditions to which Plaintiffs were exposed:

    a. Mr. Hyon Duk Shin died; and as a result, his beneficiaries incurred, as a result of his death, medical and body transportation expenses, funeral expenses, lost Mr. Hyon Duk Shin's financial contributions, lost Mr. Hyon Duk Shin's household support; and lost, among other available category of damages, Mr. Hyon Duk Shin's love, guidance, and support;

b. All Plaintiffs suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to post-traumatic stress, insomnia, and lack of appetite. The Plaintiffs' earning capacity has been impaired; and the adult Plaintiffs lost wages they would have otherwise earned. These injuries and damages are permanent and continuing in nature, and Plaintiffs will suffer the losses and impairments in the future.

**WHEREFORE**, Plaintiffs demand judgment for all damages recoverable under the law and demand trial by jury.

## COUNT VII: DEATH ON THE HIGH SEAS ACT
## 46 U.S.C. SECTIONS 30301–30308

117. Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs 1 through 76 above, as though alleged more fully herein.

118. At all times material hereto, Defendants owed decedent a duty of reasonable care under the Death on the High Seas Act, 46 U.S.C. Sections 30301–30308.

119. NCL, its agents, servants, and employees, breached NCL's duty to provide the decedent with reasonable or ordinary care under the circumstances, evincing a conscious disregard of the consequences, based on the following conduct:

a. Failure to cancel or modify access to the subject excursion in light of the long history of life-threatening events in the area, recurring conditions, and current adverse weather conditions;

b. Failure to acknowledge the strong current at the beach bay naturally occurring in the subject area and strengthened that day by the low-pressure system near Bermuda's shores at the time of NCL's cruise;

c. Failure to acknowledge the strong undertow at the beach bay naturally occurring in the subject area and strengthened that day by the low-pressure system near Bermuda's shores at the time of NCL's cruise;

d. Failure to provide look-outs or lifeguards in the subject area;

e. Promotion by NCL of the subject area as a "more controlled environment" hand selected by NCL, and an "easy" activity level, thereby implying that the area was reasonably safe under the circumstances, when in fact it was not;

f. Failure to adequately warn passengers (including the Plaintiffs) of the strong *current* naturally occurring in the subject area, and strengthened that day by the low-pressure system near Bermuda's shores at the time of NCL's cruise;

g. Failure to adequately warn passengers (including the Plaintiffs) of the strong *undertow* naturally occurring in the subject area, and strengthened that day by the low-pressure system near Bermuda's shores at the time of NCL's cruise;

h. Failure to adequately warn passengers (including the Plaintiffs) that there would be no lifeguards or look outs at the subject location;

i. Failure to adequately warn or communicate to passengers (including the Plaintiffs) that NCL does not adequately inspect the scene used for the subject excursion, despite the subject excursion being promised as a "more controlled environment" selected by NCL;

j. Infliction of severe emotional distress as Mr. Hyon Duk Shin—Plaintiff Ashley Gong's husband, the young Minor Plaintiffs' father, and Kwang Shin's son—drowned while on vacation, during which the Plaintiffs attempted to rescue Duk Shin and frantically save his life with delayed and limited help, resulting in the loss of their closest family member directly in front of them, and then having to go through the autopsy process, and funeral;

k. NCL's representations to Plaintiffs that the subject excursion, and specifically the activity of "swimming" was "easy"; when in reality, it was not "easy" because of the presence of life-threatening current and undertow and lack of lifeguards, which NCL knew about and should have known about;

l. NCL's representations to Plaintiffs that choosing an NCL excursion site would offer "a more controlled environment" where NCL would keep guests "as safe as possible" when in reality, Horseshoe Bay Beach had exhibited life-threatening current, undertow and a lack of lifeguards, which NCL knew and should have known about; and

m. NCL's representation or implication that it closely watched its excursion sites to ensure its passengers' safety, when in reality, Horseshoe Bay Beach had exhibited life-threatening currents, undertow and a lack of lifeguards, which NCL knew about and should have known about.

120.     As a direct result of the foregoing dangerous conditions to which Plaintiffs were exposed:

    a.  Mr. Hyon Duk Shin died; and as a result, his beneficiaries incurred, as a result of his death, medical and body transportation expenses, funeral expenses, lost Mr. Hyon Duk Shin's financial contributions, lost Mr. Hyon Duk Shin's household support; and lost, among other available category of damages, Mr. Hyon Duk Shin's love, guidance, and support;

    b.  All Plaintiffs suffered severe mental distress, including, but not limited to, anxiety, emotional flashbacks and depression; with physical manifestations, which include, but are not limited to post-traumatic stress, insomnia, and lack of appetite. The Plaintiffs' earning capacity has been impaired; and the adult Plaintiffs lost wages they would have otherwise earned. These injuries and damages are permanent and continuing in nature, and Plaintiffs will suffer the losses and impairments in the future.

**WHEREFORE**, Plaintiffs demand judgment for all damages recoverable under the Death on the High Seas Act against Defendant and demand trial by jury.

## DEMAND FOR TRIAL BY JURY

Plaintiffs, YANLI GONG, Individually and as Personal Representative for the Estate of Hyon Duk Shin, deceased, and as Parent and Natural Guardian of M.S. and C.S. (minors), and KWANG SHIN, Individually, hereby demand trial by jury of all issues that are triable as a matter of right.

**DATED**: March 25, 2025

/s/  Frank Butler, Esq.
Frank D. Butler, Esq.
FBN: 940585
fdblawfirm@aol.com
Jana Ranieri Cortina, Esq.
FBN: 771740
JCortina@fightingforfamilies.com
**Frank D. Butler, P.A.**
10550 US Highway 19 North
Pinellas Park, FL 33782

Phone: 727-399-2222
Fax: 727-399-2202
Service: courtdocserve@fdblawfirm.com
Secondary: kallen@fightingforfamilies.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2025, the foregoing was filed with the Clerk of the Court via CM/ECF and served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

*/s/  Frank Butler, Esq__*
Frank D. Butler, Esq.
FBN: 940585
